IN THE UNITED STATES WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| KATI WALL, MICHAEL JOHNSON, Individually and as Personal Representatives of The Estate of DENNIS JOHNSON and the Estate of SARA JOHNSON, AND DENNIS JOHNSON JR., CHRISTOPHER JOHNSON, DEANNA STATON, AND JAMES GRAHAM, | § § § § § § § § § § | |
| Plaintiffs | § § § § | NO: 5:18-951 |
| vs. | § § | |
| UNITED STATES OF AMERICA, | § § § | |
| Defendant | § § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

This case arises out of negligence by the United States of America and its agencies causing the massacre at Sutherland Springs First Baptist Church on November 5, 2017. Plaintiffs Kati Wall, Michael Johnson, Individually and as Personal Representatives of The Estate of Dennis Johnson and the Estate of Sara Johnson, and Dennis Johnson, Jr., Christopher Johnson, Deanna Staton, and James Graham bring this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674 against the United States of America and would respectfully show the following.

## TABLE OF CONTENTS

I.  PARTIES ...................................................... 4

II. BACKGROUND .................................................. 4

    A.  *Congress passed key legislation to prevent shootings like the Sutherland Springs shooting.* ........................................ 5

    B.  *Federal Law creates a mandatory, non-delegable duty for the Air Force to report a conviction for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment.* ........................................ 8

    C.  *The Department of Defense and Department of the Air Force have a history of failing to submit reportable incidents to the FBI's National Instant-Background System database.* ........................... 11

III. DEVIN KELLEY .............................................. 12

    A.  *The Air Force knows Devin Kelley's violent history.* .............. 12

    B.  *The Air Force commits Devin Kelley to a mental health facility.* ... 15

    C.  *The Air Force convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year.* ........ 15

    D.  *The Air Force fails to report Devin Kelley's domestic violence conviction, his incarceration for a crime punishable by more than one year, or his commitment to psychiatric inpatient care.* ...................... 17

    E.  *The Air Force fails to submit Devin Kelley's fingerprint data and conviction to the FBI's criminal background check database.* ....... 18

IV. CAUSES OF ACTION ........................................... 20

    A.  *The Department of the Air Force was negligent.* .................. 20

    B.  *The Department of Defense was negligent.* ....................... 22

V.        CAUSATION ............................................................................. 22

      A.   *Department of Defense and Department of the Air Force's negligence caused injuries to the Plaintiffs.*................................................22

      B.   *Had the Air Force reported Kelley's history, the FBI's Instant Criminal Background Check System would have blocked Devin Kelley's firearm purchase.* ...........................................................................23

VI.       DAMAGES ...............................................................................24

VII.      JURISDICTION, VENUE, & SERVICE ................................. 26

VIII.     LIABILITY OF THE UNITED STATES ................................27

IX.       JURISDICTIONAL ALLEGATIONS ......................................28

## I.  PARTIES

1.1     Defendant is the United States of America.

1.2     Plaintiff Kati Wall resides in Floresville, Texas, within the jurisdiction of this Court.

1.3     Plaintiff Michael Johnson resides in Floresville, Texas, within the jurisdiction of this Court.

1.4     Plaintiff Dennis Neil Johnson, Jr. resides in La Vernia, Texas, within the jurisdiction of this Court.

1.5     Plaintiff Christopher Johnson resides in Poth, Texas, within the jurisdiction of this Court.

1.6     Plaintiff Deanna Staton resides in Floresville, Texas, within the jurisdiction of this Court.

1.7     Plaintiff James Graham resides in Pierson, Florida.

1.8     Plaintiffs Kati Wall and Michael Johnson are the legally appointed representatives of the estate of Sara Johnson and Dennis Johnson. The court approved letters of representation of the estates are attached as Exhibit 1.

## II.  BACKGROUND

2.1     Through several pieces of legislation spanning almost 30 years, Congress acted to block individuals who present a known risk of violence from purchasing firearms. To that end, Congress mandated that certain individuals must be flagged in an instant criminal background check system used by firearms sellers nationwide in the interest of public safety. The Air Force and Department of Defense ignored three

statutory mandates that required Devin Kelley's entry into the background check system: his domestic violence conviction, his conviction for a crime punishable by imprisonment for over a year, and his commitment to a mental institution. As a direct result of the Air Force and Department of Defense's failure to flag Kelley in the FBI database, his domestic violence escalated into a murderous shooting rampage targeting his ex-wife's family and neighbors at the Sutherland Springs First Baptist Church on November 5, 2017.

## A.   Congress passed key legislation to prevent shootings like the Sutherland Springs shooting.

2.2   Federal law makes it unlawful to sell a firearm to a person whom the seller knows or has reasonable cause to believe is someone who (a) has been convicted of a misdemeanor crime of domestic violence; (b) has been convicted of a crime punishable by imprisonment for longer than a year; or (c) has been committed to any mental institution. 18 U.S.C. § 922(d)(1), (4), (9). These categories of individuals are forbidden from possessing firearms. *Id.* § 922(g).

2.3   Congress attempted to quell the dangers presented by mass shooters like Devin Kelley before he was even born. Initially passed as the Gun Control Act of 1968, the law banned the sale of firearms to those individuals with criminal histories and those individuals who have been committed to mental institutions.

2.4   In 1993, Section 103 of the Brady Handgun Violence Prevention Act required the Attorney General of the United States to establish an instant criminal background check system that a firearm seller must use to determine whether the sale of the firearm violates 18 U.S.C. § 922. Under 18 U.S.C. § 922(t), a licensed dealer of firearms

shall not sell or transfer to any person without first contacting the national instant

criminal background check system.

    2.5    Congress passed the Brady Bill to prevent shootings just like the Sutherland

Springs shooting. When the Brady Bill was introduced in the House, one of the Bill's

sponsors explained that express purpose:

> Mr. Speaker, I rise to strongly support today's introduction of
> the Brady bill. Five years ago, a man named Larry Dale
> walked into Mercer's Discount Foods in Tulsa, OK, and
> opened fire on an unsuspecting crowd of shoppers. Dale's
> rampage killed one person and severely wounded another.
> Many Oklahomans were outraged to learn that Dale, a
> convicted felon with a history of mental illness, had walked
> into a gun store the day before his crime, filled out a single
> form, and walked out with his instrument of death. The
> tragedy is that 5 years after Larry Dale proved how flawed the
> system is, the Brady Bill is not the law of the land.[1]

    2.6    When the Brady Bill went to committee, the Chairman's opening statement

in the House Subcommittee hearings noted that the Brady Bill would effectively prevent

barred individuals from purchasing firearms:

> We are meeting today to consider a bill whose time has come-
> the Brady Handgun Violence Prevention Act....
>
> There is nothing complicated about this bill. ... It will save
> lives. The Brady bill will save lives that are being wasted in an
> epidemic of handgun violence from Brooklyn to Florida and
> all across America. And that is not theory, that is fact.
>
> After Brady passes, a convicted felon will no longer be able to
> walk into a gun store, as thousands have done this year, and
> walk out 10 minutes later with a murder weapon. State after

---

[1] Congressional Record, House, at H731 (Feb. 22, 1993).

State has shown that waiting periods and background checks work.[2]

2.7     The committee issued the House Committee Report. Under the heading

"Summary and Purpose," the committee reported:

> The purpose of H.R. 1025 is to prevent convicted felons and other persons who are barred by law from purchasing guns from licensed gun dealers, manufacturers or importers.

The House report underscored that background checks are necessary to prevent violent

offenders from gaining access to firearms:

> The experiences of States which require background checks before firearm sales also indicate that many repeat offender criminals buy guns directly from firearms dealers. For example, in California, a background check intercepted 2,500 felons attempting to buy guns from dealers last year. ... Each year in Illinois some 3,000 prohibited persons seek to purchase firearms and are denied.[3]

2.8     In 1996, the Domestic Violence Offender Gun Ban, also referred to as the

"Lautenberg Amendment," made it unlawful to sell firearms to anyone convicted of a

misdemeanor crime of domestic violence. Congress enacted the Domestic Violence

Offender Gun Ban to "close [a] dangerous loophole" in the gun control laws:  while felons

---

[2] Brady Handgun Violence Protection Act, hearing before the Subcommittee on Crime and Criminal Justice of the House Judiciary Committee (Sept. 30, 1993).

[3] H. Rep. No. 103-344, Brady Handgun Violence Prevention Act (Nov. 10, 1993).

had long been barred from possessing guns, many perpetrators of domestic violence are convicted only of misdemeanors.[4]

2.9     In abusive relationships, the severity of domestic violence often increases over time, and the presence of a firearm increases the likelihood of homicide.[5] Congress recognized that "[f]irearms and domestic strife are a potentially deadly combination."[6]  As one Senator noted during the debate over § 922(g)(9), "[A]ll too often, the only difference between a battered woman and a dead woman is the presence of a gun." 142 Cong. Rec. 22986 (1996) (statement of Sen. Wellstone).

**B.     Federal Law creates a mandatory, non-delegable duty for the Air Force to report a conviction for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment.**

2.10     Federal law requires Government agencies to report ineligible firearm purchasers to a national database. Specifically, 34 U.S.C. § 40901(e)(1)(C) states that federal agencies that have "any record of any person demonstrating" that the person should not be able to purchase a gun "shall, not less frequently than quarterly, provide the pertinent information contained in such record to" the Attorney General for the

---

[4] *United States v. Castleman*, 134 S. Ct. 1405, 1408–09 (2014) (citing *United States v. Hayes,* 555 U.S. 415, 426 (2009)).

[5] *See id.,* at 14–15; Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, DOJ, Nat. Institute of Justice J., No. 250, p. 16 (Nov. 2003) ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed").

[6] *See Voisine v. United States*, 136 S. Ct. 2272 (2016) citing *Hayes,* 555 U.S. at 427.

national instant criminal background check system. Section 40901(e)(1)(D) creates an obligation on agencies to correct and update these records.

2.11    Title 10, U.S.C. section 1562 requires that the Department of Defense establish a central database of information on the incidents of domestic violence involving members of the armed forces. This section also requires that all military departments, including the Department of the Air Force, report domestic violence incidents.

2.12    It is Department of Defense policy that all Department agencies, including the Department of the Air Force, comply with the (a) crime reporting requirements of the Uniform Federal Crime Reporting Act of 1988; (b) reporting requirements for victim and witness assistance notifications of the Victim's Rights and Restitution Act of 1990, and (c) reporting requirements of the Brady Handgun Violence Prevention Act.

2.13    To that end, Department of Defense Directive 7730.47 and Department of Defense Manual 7730.47-M implement federal criminal-incident reporting requirements. The Department of Defense created the Defense Incident-Based Reporting System (DIBRS) as a central repository of incident-based data. This central repository includes incidents of domestic violence and criminal incident data. The Department of Defense has a non-delegable duty to monitor and ensure compliance with Directive 7730.47 and populate data from DIRBS to the FBI's National Incident-Based Reporting System (NIBRS). The DIBRS is the tool the Department of Defense uses to collect and transmit reportable criminal incidents to the FBI's Uniform Crime Report Program. The FBI's NIBRS is used in background searches to determine whether an individual is eligible to purchase a firearm.

2.14    Department of Defense Instruction Manual 7730.47 implements the reporting requirements of numerous federal laws, including the Uniform Federal Crime Reporting Act of 1988, The Victims' Rights and Restitution Act of 1990, The Brady Handgun Violence Prevention Act, The Lautenberg Amendment to the Gun Control Act, and The Jacob Wetterling, Megan Nicole Kanka, and Pam Lychner Sex Offender Registration and Notification Program. This instruction manual mandates that Department of Defense agencies, including the Air Force, report criminal incident data to the FBI, maintain a 4 percent or less data submission error rate, and correct errors within 30 days of notification of the error. Department of Defense Manual 7730.47-M Volume 1 implements the policy of Manual 7730-47 and prescribes reporting requirements pursuant to the various federal laws.

2.15    Department of Defense Manual 7730.47-M Volume 1, Enclosure 3, prescribes the reporting data elements needed to comply with Federal criminal incident reporting pursuant to federal law. Enclosure 3 states the Defense Incident-Based Reporting System:

> shall be used to centralize the collection of information that is reportable by the DoD Components pursuant to The Brady Handgun Violence Prevention Act of 1993, which requires the Department of Defense to report these eight categories to the FBI for purposes of prohibiting firearm purchases:
>
> (1) Persons who have been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year. ...
>
> (4) Persons who have been adjudicated as mental defectives or who have been committed to a mental institution. ...
>
> (7) Persons convicted in any court of a misdemeanor crime of domestic violence.

2.16    The United States Air Force had the responsibility to report court-martial convictions of domestic violence, and commitments of active-duty soldiers to inpatient psychiatric or mental healthcare facilities to the Department of Defense's Incident-Based Reporting System database.

## C.    The Department of Defense and Department of the Air Force have a history of failing to submit reportable incidents to the FBI's National Instant-Background System database.

2.17    The United States Inspector General evaluated the Department of Defense and its agencies, including the Department of the Air Force, process for reporting accurate criminal incident data to the Defense Incident-Based Reporting System. The Inspector General issued his findings in Report Number DOGIG-2015-011.

2.18    The Inspector General found that the Department of Defense "is not reporting criminal incident data to the Federal Bureau of Investigation (FBI) ... as required by Federal law." As a result, "10 years of DoD criminal incident data have not been provided to the FBI...." As an example of reporting failure, the Inspector General noted that between August 2012 and January 2013 the Air Force failed to report data to the Defense Incident-Based Reporting System because the employee responsible had left the job and the replacement employee was not trained.

2.19    The Inspector General concluded:

> Our evaluation determined DoD has not completed the FBI's requirements for the DIBRS database certification; therefore, DoD does not report criminal incident data to the Attorney General, through the FBI.

2.20    Between approximately 2005 and 2015, the Defense Incident-Based Reporting System database did not populate its data into the FBI's National Incident-Based Reporting System.

2.21    Before 2016, the United States knew or should have known that failure to report criminal incident data could foreseeably result in mass shootings. For example, on June 17, 2015, Dylan Roof shot and killed nine people at Emanuel African Methodist Episcopal Church in Charleston, South Carolina. Roof should have been blocked by the background check system from purchasing the gun that he used to kill those victims. Then FBI Director James Comey concluded: "But the bottom line is clear: Dylan Roof should not have been able to legally buy that gun that day." Director Comey promised to have a full review of the matter conducted by the Inspection Division within 30 days.

2.22    In another high-profile mass shooting, on April 16, 2007, Seung-Hui Cho shoot and killed 32 people on the Virginia Tech campus. In 2005, Mr. Cho had been adjudicated by a court to be mentally ill and involuntarily committed to a mental health facility. However, because Virginia state authorities had not reported Mr. Cho to the FBI, Mr. Cho was able to purchase the firearms used in the shooting.

## III.    DEVIN KELLEY

### A.    The Air Force knows Devin Kelley's violent history.

3.1    Devin P. Kelley had a long, troublesome history with the United States Air Force. Mr. Kelley entered active duty on January 5, 2010. He was initially assigned to an Intelligence Specialist program but was cut from the program due to poor grades. The

United States then transferred him to the 49th Logistics Readiness Squadron at Holloman Air Force Base, New Mexico.

3.2     Between July 2011 and March 2012, the Air Force placed in Mr. Kelley's employment file at least four letters of counseling and at least five letters of reprimand. Mr. Kelley's conduct included failure to obey direct orders, creating a hostile work environment, making false statements, and insubordination of a superior officer. In at least seven of these letters, Mr. Kelley was warned that his conduct was a criminal act. In at least three of these letters, the Air Force told Mr. Kelley that he had proven that he could not be depended upon. In at least two of these letters, the Air Force noted that Mr. Kelley could not always be trusted and had demonstrated a disregard for the Air Force's core values.  In each of these letters, the Air Force warned Mr. Kelley that future misconduct would lead to more severe punishment.

3.3     During Mr. Kelley's service, he was caught trying to sneak firearms on to Holloman Air Force Base. Military officers were advised that Kelley was attempting to carry out death threats made to his commanding officers.

3.4     While serving in the Air Force, Mr. Kelley began dating Tessa K. Kelley (neé Loge) and married her on April 12, 2011. She had a child from a former relationship. In late April of 2011, Tessa Kelley moved into base housing on Holloman Air Force Base. Devin Kelley abused both Ms. Kelley and her child on base. He would push and hit the child, often on the child's head. On at least two occasions, Mr. Kelley hit the child hard enough to cause death or serious bodily injury. On June 8, 2011, Tessa Kelley took her child to Gerald Champion Medical Center in Alamogordo, New Mexico because he was vomiting. The attending pediatrician noticed not only vomiting, but febrile seizure and

bruising to the left side of the child's face. A CT scan revealed a fractured clavicle and subdural hemorrhage (bleeding on the brain). After the fact, Devin Kelley admitted to the United States Air Force that he caused these injuries without excuse or justification. Devin Kelley produced a video confessing to his wrongful conduct.

3.5     The NM Children, Youth, and Families Department took the child into their custody.

3.6     Between June 24, 2011, and April 27, 2012, Devin Kelley also abused Tessa Kelley. He would punch her, choke her, pull her hair, and kick her. Foreshadowing the violence to come, Kelley threatened Tessa Kelley that if she ever told anyone about the abuse, he would "kill [her] and [her] entire family." He told her, "I could just bury you some where here in the desert and nobody would ever find you." On April 23, 2012, while driving to El Paso, TX, Kelley took out his gun and held it against Tessa Kelley's temple and said, "Do you want to die?" Tessa Kelley pushed the gun away and Mr. Kelley placed the gun in his mouth. He told her he would kill her if she told anyone. Further, Tessa Kelley alleged that Devin Kelley sexually assaulted her during the marriage. Devin Kelley admitted these facts to the Air Force in November 2012.

3.7     Devin Kelley abused Tessa Kelley multiple times and admitted this violent conduct to the Air Force. At least once, Air Force security was called to the residence when Devin Kelley choked Tessa Kelley for at least 15-20 seconds. Mr. Kelley admitted to the Air Force that there was no justification or excuse for his violent conduct.

**B.**     **The Air Force commits Devin Kelley to a mental health facility.**

3.8     As a result of Devin Kelley's work conduct, threats made by Mr. Kelley, and the domestic abuse of his wife and child, the Government ordered Kelley confined to Peak Behavioral Health Services. Peak is a private psychiatric hospital that has special programs for the care of active duty service members. Upon information and belief, the United States has a contractual relationship with Peak to offer inpatient commitment and therapy.

3.9     While receiving inpatient care at Peak, Mr. Kelley made several threats that if he were picked up by Security Forces, he would go for their guns. While at Peak, Devin Kelley tried to obtain firearms and conducted research into body armor. Mr. Kelley was trying to carry out threats he made against his chain of command. He made these plans to purchase another firearm because his other weapons had been confiscated by the Air Force, its agents, or contractors.

3.10     Devin Kelley escaped Peak Behavioral on June 7, 2012, by jumping a fence with arrangements to purchase a firearm. Before he could, he was caught by Texas authorities the next day.

**C.**     **The Air Force convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year.**

3.11     The Air Force court-martial alleged several charges against Devin Kelley:

(a) Mr. Kelley violated UCMJ Art. 86 by fleeing Peak Behavioral Health Services Facility;

(b) Mr. Kelley violated UCMJ Art. 128 by causing physical injury to his stepson, including the broken clavicle and subdural hematoma; (c) Mr. Kelley violated UCMJ Art. 128 by

holding a gun to Tessa Kelley's temple and asking if she wanted to die; and (d) Mr. Kelley

violated UCMJ Art. 134 by threatening to kill Tessa Kelley, members of her family, and

members of his squadron.

3.12    The probable cause findings for Mr. Kelley's charges stated:

> The evidence presented during the hearing clearly indicates
> that the minor child … was subject to physical abuse. The
> evidence also indicates that Mrs. Tessa Kelley was assaulted
> by a weapon being placed against her head and that AIC
> Kelley had threatened her on other occasions. Finally, the
> evidence establishes that AIC Kelley left the Peak Behavioral
> Health Services facility, his place of duty, without
> authorization.

3.13    On July 10, 2012, the Air Force determined that Devin Kelley should be

confined while awaiting trial because "it is foreseeable that [Mr. Kelley] will not appear

for trial and/or will engage in serious criminal misconduct." As a basis for this

conclusion, the Air Force noted:

> The Evidence shows a serious escalation of behavior
> involving firearms and threats after the physical abuse of a
> child. Particularly alarming is his decision to try to obtain
> another firearm while undergoing inpatient mental health
> care, conducting research on body armor, and then escaping
> from the facility late at night without authorization….

> Lesser forms of restraint are inadequate to mitigate the flight
> risk he poses nor would they prevent him from carrying out
> the threats that he has made against others, especially given
> the forethought and planning that he showed by attempting
> to purchase another firearm and his escape from the mental
> health facility.

3.14    The Air Force General Court Martial Order No. 10 specifically noted at the

top of the order that this was a "Crime of Domestic Violence. 18 U.S.C. § 922(g)(9)." The

citation to section 922(g)(9) references the federal law that prevents individuals convicted of even a misdemeanor crime of domestic violence from possessing a firearm.

     3.15    Devin Kelley pleaded guilty to unlawfully striking Tessa Kelley, choking her, pulling her hair, and kicking her. He also pleaded guilty to assaulting his stepson with force likely to produce death or grievous bodily harm. His other charges were withdrawn and dismissed with prejudice as a part of his plea deal. The Air Force sentenced Devin Kelley to 12 months of imprisonment, a bad-conduct discharge, and reduction in rank to airman basic (E-1).  During Mr. Kelley's pre- and post-trial confinement, the Air Force placed him on lockdown for suicide risk. On April 10, 2014, the Air Force discharged Devin Kelley.

**D.    The Air Force fails to report Devin Kelley's domestic violence conviction, his incarceration for a crime punishable by more than one year, or his commitment to psychiatric inpatient care.**

     3.16    Under federal law and Dep't of Defense Manual 7730.47-M, Vol. 1, Enclosure 3, the United States Air Force (and its agents and employees) had a mandatory, non-delegable obligation to report Devin Kelley's indictments, convictions at court-martial, commitment to a mental institution, and domestic violence to the FBI firearms database.

     3.17    And the Department of Defense failed to ensure that its own directives were properly enforced. The Air Force had an unacceptably high failure rate of which the Department of Defense was aware. The Department of Defense's failure to manage,

supervise, and monitor the Air Force's repeated failures to comply also proximately caused Mr. Kelley's conduct and conviction to go unreported.

3.18    In 2014, the Inspector General of the Department of Defense evaluated the reporting system's compliance with its own mandatory procedures and policies. The principal finding of this investigation condemned the performance of the Department of Defense. Specifically, it found that the military was:

> not reporting criminal incident data to the Federal Bureau of Investigation (FBI) for inclusion in the annual Uniform Crime Reports to the President, the Congress, State governments, and officials of localities and institutions participating in the Uniform Crime Report Program, as required by Federal law.

3.19    As a result of this failure:

> 10 years of DoD criminal incident data have not been provided to the FBI for inclusion in the annual uniform crime reports to the President, the Congress, State governments, and officials of localities and institutions participating in the UCR Program, as implemented in DoD Directive 7730.47 and DoD Manual 7730.47-M, Volume 1.

**E.    The Air Force fails to submit Devin Kelley's fingerprint data and conviction to the FBI's criminal background check database.**

3.20    The FBI's Next Generation Identification database's primary function is to provide the FBI a fully automated fingerprint identification and criminal history reporting system. The failure to populate this database with all the required fingerprint records can allow someone to purchase a weapon who should not, hinder criminal investigations, and potentially impact law enforcement and national security interests.

3.21    Specifically, among other uses, the Next Generation Identification information is checked by Federal Firearms Licensees to instantly determine, through the FBI's National Instant Criminal Background Search System, whether a prospective buyer is eligible to buy firearms. The failure to populate FBI databases with all the required fingerprint records can result in someone purchasing a weapon who should not.

3.22    The United States' Inspector General admitted the allegations in Paragraphs 3.20 and 3.21 in Report No. DOGIG-2018-035, dated December 4, 2017. The Inspector General found that the Military Services did not consistently submit fingerprint cards and final disposition reports as required.  The Inspector General stated:

> Any missing fingerprint card and final disposition report can have serious, even tragic consequences, as may have occurred in the recent church shooting in Texas.

3.23    The Air Force criminal fingerprints are submitted to the FBI either electronically or by mail. In the time period sampled by the United States Inspector General, he found that the Air Force Security Forces failed to submit fingerprint cards and final disposition reports the majority of the time—in sixty (60) percent of cases.

3.24    In 2015, The Inspector General made recommendations to the Department of the Air Force to correct errors in the submission of fingerprint cards and final disposition reports in Report No. DOGIG-2015-081. The Air Force agreed with this recommendation. However, the Air Force took no corrective action to ensure Devin Kelley's finger prints or final criminal disposition reports were reported. And the Department of Defense did not follow its policy to monitor compliance with these reporting requirements.

# IV. CAUSES OF ACTION

## A.    The Department of the Air Force was negligent.

4.1    The Department of the Air Force negligently failed to report criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution.

4.2    The Department of the Air Force failed to submit criminal-history data to the FBI when probable cause existed in the Air Force Office of Special Investigations and Air Force Security Forces investigations on Kelley, after Kelley's court-martial conviction, and also upon his post-trial confinement at Holloman Air Force Base.

4.3    The United States, through Secretary of the Air Force Heather Wilson, admitted the allegations found in Paragraph 4.2 in response to a question by Senator Mazie K. Hirono in a submission dated December 13, 2017.

4.4    Alternatively, the Department of the Air Force negligently submitted inaccurate or incomplete criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

4.5    The Department of the Air Force negligently failed to correct incomplete or incorrectly submitted criminal-incident data to the Defense Incident-based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for

a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

4.6     The Department of the Air Force negligently failed to submit fingerprint cards and final disposition reports for Devin Kelley's criminal convictions, or alternatively submitted incomplete or incorrect data to the FBI as required by federal law. As a result, the FBI's Next Generation Identification database lacked critical information about Devin Kelley's history and failed to prevent the sale of firearms to Devin Kelley.

4.7     Preliminary findings by the Air Force Inspector General confirmed the Air Force Office of Special Investigations and Security Forces personnel then assigned at Holloman Air Force Base, New Mexico, did not report required information to civilian law enforcement in the Kelley case. The review also found the error in the Kelley case was not an isolated incident and similar reporting lapses occurred at other locations.

4.8     In fact, the problem was widespread across both the Office of Special Investigations and the Air Force Security Forces. A 2015 Defense Department audit revealed that the Air Force was not in compliance with a mandatory statutory requirement to report all offender criminal history data and, despite the discovery of non-compliance, the Air Force made no retroactive corrections.

4.9     The Department of the Air Force admitted the allegations contained in Paragraph 4.7 in a press release published on November 28, 2017. The Department of the Air Force, through the Secretary of the Air Force Heather Wilson, admitted the allegations contained in Paragraph 4.8 on December 6, 2017 before the United States Senate Judiciary Committee.

**B.      The Department of Defense was negligent.**

4.10    The Department of Defense negligently failed to ensure that the Department of the Air Force submitted the required criminal incident, fingerprint cards, and final disposition data.

4.11    The Department of Defense negligently failed to ensure that identified criminal incident data errors are tracked to correction.

4.12    The Department of Defense negligently failed to populate data about Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution from the Defense Incident-Based Reporting System into the FBI's National Incident-Based System.

## V.  CAUSATION

**A.      Department of Defense and Department of the Air Force's negligence caused injuries to the Plaintiffs.**

5.1      One or more of the above negligent acts of the Department of the Air Force and the Department of the Defense directly and proximately caused injury to the Plaintiffs.

5.2      When Devin Kelley attempted to purchase firearms to use in the Sutherland Springs shooting, the FBI Incident-Based Reporting System should have included Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution. The FBI's database did not contain any of this required information, or alternatively,

contained incorrect or incomplete information, as a direct and proximate result of one or more of negligent acts of the Department of Defense and Department of the Air Force.

5.3    When Devin Kelley attempted to purchase firearms to use in the Sutherland Springs shooting, the FBI's National Instant Criminal Background Search System should have contained Devin Kelley's criminal history, populated from the FBI's Next Generation Identification system. However, because of the Government's negligence, Kelley's fingerprint identification and criminal disposition reports were not submitted to the FBI and the FBI's Background Check System did not contain Kelley's convictions.

5.4    When Devin Kelley attempted to purchase the firearms used in the Sutherland Springs shooting, the sale should have been blocked for one or more of the following reasons: (a) he had a conviction of a crime punishable by imprisonment for a term exceeding one year; (b) he had a conviction for domestic violence; and (c) he had previously been committed to a mental institution.

5.5    When Devin Kelley purchased the firearms used in the Sutherland Springs shooting, his omission from the FBI's background check system and ability to complete the purchase was a direct, proximate, and foreseeable result of one or more acts of negligence of the Department of Defense and Department of the Air Force.

**B.    Had the Air Force reported Kelley's history, the FBI's Instant Criminal Background Check System would have blocked Devin Kelley's firearm purchase.**

5.6    Devin Kelley purchased the firearms used in the Sutherland Springs shooting in April 2016 from a federal firearms licensee, Academy Sports & Outdoor. At

the time, the licensee must submit biographical information about Kelley to the FBI's Instant Criminal Background Check System. If the Air Force had properly reported Devin Kelley's history to the FBI, the Background Check System would have informed the firearms dealer to deny the purchase.

5.7     The purpose of the Uniform Federal Crime Reporting Act of 1988, the Brady Handgun Violence Prevention Act, and the Domestic Violence Offender Gun Ban are to ensure that violent offenders and high-risk individuals like Mr. Kelley do not get access to firearms. The Department of Defense in 1994 began designing the Defense Incident-Based Reporting System (DIBRS) to meet criminal justice related reporting requirements mandated by the Uniform Federal Crime Reporting Act and the Brady Handgun Violence Prevention Act. The DIBRS permits the DOD to forward offense and arrest information required by FBI.

5.8     The entry into the federal law-enforcement database would have blocked Mr. Kelley's purchase of the firearms used in the Sutherland Springs' shooting. The Government's acts or omissions directly and proximately resulted in Devin Kelley's purchase of the firearms used in the November 5, 2017 Sutherland Springs First Baptist Church shooting.

## VI. DAMAGES

6.1     Devin Kelley used the guns he purchased at Academy Sports & Outdoor to kill twenty-six individuals and injure twenty others on November 5, 2017.

6.2     Dennis Johnson was shot and killed on November 5, 2017, with firearms that should have been denied to Devin Kelley. As a result of the negligence of the United

States employees, agents, or representatives, the Estate of Dennis Johnson suffered damages for which recovery is sought, including:

> Past physical pain & suffering;
> Past mental anguish;
> Past medical expenses;
> Past and future lost income and earning capacity, and
> Funeral and burial expenses.

6.3     In addition, Plaintiffs Kati Wall and Michael Johnson, as personal representatives of the Estate of Dennis Johnson, seek recovery of all other damages to which they are entitled pursuant to the applicable state and federal law.

6.4     Sara Johnson was shot and killed on November 5, 2017, with firearms that should have been denied to Devin Kelley. As a result of the negligence of the United States employees, agents, or representatives, the Estate of Sara Johnson, suffered damages for which recovery is sought, including:

> Past physical pain & suffering;
> Past mental anguish;
> Past medical expenses;
> Past and future lost income and earning capacity, and
> Funeral and burial expenses.

6.5     In addition, Plaintiffs Kati Wall and Michael Johnson, as personal representatives of the Estate of Sara Johnson, seek recovery of all other damages to which they are entitled pursuant to the applicable state and federal law.

6.6     As a result of the negligence of the United States employees, agents, or representatives, Plaintiffs Kati Wall, Michael Johnson, Dennis Neil Johnson, Jr., Christopher Johnson, Deanna Staton, and James Graham, as children of the deceased, suffered damages for which individual recovery is sought, including:

> Past and future mental anguish;

> Past and future loss of consortium with their father, Dennis Johnson;
> Past and future loss of consortium with their mother, Sara Johnson;
> Past and future loss of companionship and society with their father and mother, Dennis and Sara Johnson;
> Past and future loss of pecuniary contributions, including loss of advice, counsel, services, care, support, and maintenance from their mother and father;
> Past and future loss of services from their mother and father, including loss of their parents' nurturing, care, education, and guidance;
> Loss of inheritance;
> Out of pocket expenses; and
> Other pecuniary damages.

6.7    In addition, Plaintiffs Kati Wall, Michael Johnson, and Dennis Neil Johnson, Jr., Christopher Johnson, Deanna Staton, and James Graham seek recovery of all other damages to which they are entitled pursuant to the applicable state and federal law.

## VII.    JURISDICTION, VENUE, & SERVICE

7.1    This Federal District Court has federal-question jurisdiction of this action because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–2680, commonly known as the Federal Tort Claims Act.

7.2    Venue is proper in this district pursuant to 28 U.S.C. § 3191(b)(2) because a substantial part of the events giving rise to the claim occurred in this district.

7.3    The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure. Service is affected by serving a copy of the Summons and Complaint on the United States Attorney John F. Bash, United States Attorney for the Western District of Texas by certified mail, return receipt requested at his office:

> United States Attorney's Office
> ATTN: Civil Process Clerk
> 601 NW Loop 410, Suite 600
> San Antonio, Texas 78216

7.4     Service is also affected by serving a copy of the Summons and Complaint

on Jeff Sessions, Attorney General of the United States, by certified mail, return receipt

requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

## VIII.    LIABILITY OF THE UNITED STATES

8.1     This case is commenced and prosecuted against the United States of

America to and in compliance with Title 28 U.S.C. §§ 2671-80, the Federal Tort Claims

Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because

the personal injuries and resulting damages of which the complaint is made were

proximately caused by the negligence, wrongful acts or omissions of employees or agents

of the United States of America working for the United States Department of the Air

Force or Department of Defense, while acting within the scope of their office,

employment, or agency under circumstances where the United States of America, if a

private person, would be liable to the Plaintiffs in the same manner and to the same

extent as a private individual.

8.2     The United States Departments of Defense and Department of the Air

Force are agencies of the United States. The Defendant, the United States of America,

through its agencies, at all times material to this lawsuit, owned and operated Holloman

Air Force Base and staffed its facilities and vehicles with its agents, servants and employees. The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Defense Manpower Data Center, which operates the Defense Incident-Based Reporting System.

8.3    This lawsuit is not a claim listed in 28 U.S.C. § 2680, exceptions to the Federal Tort Claims Act.

## IX. JURISDICTIONAL ALLEGATIONS

9.1    Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth here were filed with and presented administratively to the United States of America. The United States Department of the Air Force acknowledged receipt on March 12, 2018, stating that it had received Plaintiffs' claims on March 9, 2018. Each claim stated a "sum certain."

9.2    The United States failed to make final disposition of this claim within six (6) months of presentation of their claims. This action was filed greater than six (6) months from the presentation of the claims underlying the lawsuit.

9.3    Accordingly, Plaintiffs have complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this lawsuit.

## CONCLUSION

Plaintiffs request that Defendant be cited to appear and answer this Complaint; that upon final trial, the Plaintiffs have judgment against Defendant, for the amount of actual damages and for other and different amounts as they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all

Court costs incurred in this litigation; and for such other relief, at law and in equity, both general and special, to which Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

Respectfully Submitted,

/s/ Jamal K. Alsaffar
JAMAL K. ALSAFFAR
 jalsaffar@nationaltriallaw.com
 Texas State Bar #2402719
LAURIE HIGGINBOTHAM
 lhigginbotham@nationaltriallaw.com
 Texas State Bar # 50511759
TOM JACOB
 tjacob@nationaltriallaw.com
 Texas State Bar #24069981
KOBY KIRKLAND
 kkirkland@nationaltriallaw.com
 Texas State Bar #24086587
WHITEHURST, HARKNESS, BREES, CHENG,
 ALSAFFAR, HIGGINBOTHAM, & JACOB
 P.L.L.C.
 7500 Rialto Blvd, Bldg. Two, Ste 250
 Austin, TX 78735
 (512) 476-4346 (o)
 (512) 467-4400 (f)

Attorneys for the Plaintiffs